UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LINDA BECKER, Independent Administrator for the Estate of THOMAS BECKER, | )<br>)<br>)<br>) |
| Plaintiff, | ) Case No. 19-cv-1426 |
| v. | )<br>) Hon. Jorge L. Alonso |
| AMAZON.COM SERVICES, INC., | )<br>) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

After her husband died from a heart attack while working for a contractor at defendant's facility, plaintiff Linda Becker filed this negligence suit. Defendant Amazon.com Services, Inc. removed the case to this Court[1] and, after discovery, filed a motion for summary judgment. For the reasons set forth below, the Court grants defendant's motion for summary judgment.

**I.      BACKGROUND**

The following facts are undisputed unless otherwise noted.[2]

---

[1] The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1), because plaintiff is a citizen of Illinois, defendant is a Delaware corporation with its principal place of business in Washington and the amount in controversy is greater than $75,000.00. [Docket 91 at ¶¶ 3-4].

[2] Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment. The Court enforces Local Rule 56.1 strictly. *See FTC v. Bay Area Business Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005) ("Because of the important function local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules."). At the summary judgment stage, a party cannot rely on allegations; she or it must put forth evidence. Fed.R.Civ.P. 56(c)(1)(A); *see also Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) ("As the 'put up or shut up' moment in a lawsuit,' summary judgment requires a non-moving party to respond to the moving

Defendant operates an approximately one-million-square-foot facility in Joliet, Illinois, where decedent Thomas Becker ("Becker") was employed by an entity called C&W, which provided services to defendant at the facility.

While Becker was employed by C&W, he faced several risk factors for heart attack. First, Becker had some history of high cholesterol (the parties dispute whether his cholesterol was under control in the last few years of his life), which put him at risk for cardiac injury or cardiac arrest. Second, Becker was a smoker for thirty years (although the parties dispute the quantity of cigarettes Becker smoked each day). Finally, Becker was part of a family that had experienced heart disease. Becker's brother had died from coronary artery disease at the age of 45, and Becker's father died from, among other things, congestive heart failure.

---

party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial.").

Where one party supports a fact with admissible evidence (i.e., not complaint allegations) and the other party fails to controvert the fact with citation to admissible evidence (i.e., not complaint allegations), the Court deems the fact admitted. See *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004). This does not, however, absolve the party putting forth the fact of the duty to support the fact with admissible evidence. See *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012).

In considering a motion for summary judgment, this Court does not consider facts that parties failed to include in their statements of fact, because to do so would unfairly eliminate the opposing party's opportunity to show that the fact is disputed and make the Court's job of searching for disputed facts extremely difficult and excessively time consuming. See *Torres v. Alltown Bus Services, Inc.*, Case No. 05 C 2435, 2008 WL 4542959 at *1 n.1 (N.D. Ill. Apr. 28, 2011) ("To consider facts not included in a statement of facts would be unfair to the other party, because it would rob the other party of the opportunity to show such facts were controverted."), aff'd 323 Fed. Appx. 474, 475 (7th Cir. 2009) ("Since we have already held that it is not an abuse of discretion for a court to refuse to consider evidence whose manner of submission violated local rules, we cannot say that the district court abused its discretion in this case.").

On January 23, 2017, before 4:00 a.m., Becker and a few other C&W employees were in the "shop cage" area of defendant's Joliet facility. At some point before 4:00 a.m. (the parties dispute the precise time), Becker had a heart attack.

Two C&W employees noticed Becker's distress. George Arreguin ("Arreguin") noticed Becker sweating, shaking, grasping his chair and cramping his arm to his chest. Paul Helenhouse ("Helenhouse") noticed that Becker was slumped in his chair and was nonresponsive. Helenhouse and Arreguin moved Becker from his chair to the ground. Helenhouse checked for a pulse and breathing and found none. Arreguin saw Becker take long, paused breaths approximately thirty seconds apart. Arreguin used his radio to call AmCare. (Plaintiff put forth evidence that the call occurred at 3:55 a.m., but defendant disputes the precise time.)

AmCare is an onsite medical clinic at the Joliet facility. It is located on the opposite side of the facility relative to Becker's location in the shop cage. At the time of Becker's emergency, the onsite medical specialist was Ruben Espinosa ("Espinosa"), who was certified both as an emergency technician basic ("EMT-B") and in cardiopulmonary resuscitation ("CPR"). Arreguin's call to AmCare was received by Joey Guttierrez ("Guttierrez"), who worked for defendant as a safety specialist. Within seconds, Guttierez told Espinosa, who was also located in AmCare, that he needed to go to the shop cage because someone might be having a seizure.

The AmCare office contained an automatic external defibrillator ("AED"), but Espinosa did not take it with him when he left AmCare to reach Becker in the shop cage. The parties dispute the precise amount of time it took Espinosa to reach Becker after leaving AmCare, but they agree it was less than three minutes.

3

In the meantime, C&W employee Charles Nowak, according to his own testimony (which plaintiff disputes), had left Becker's side to retrieve an AED, thinking Becker might need one. The parties agree that an AED is a device that can help save the life of a person in cardiac arrest. An AED assesses a person's heart rhythm and, if it detects a shockable rhythm, tells the user to shock the person in the hopes of resetting the heart. Nowak testified that he had returned with an AED before Espinosa arrived, but plaintiff disputes the timing of Nowak's return with the AED. It is undisputed that when Espinosa arrived, Helenhouse, who was also certified in CPR, was preparing to perform CPR on Becker. Espinosa told Helenhouse to clear out.

It is undisputed that when Espinosa arrived, Becker was unconscious on the floor. The parties dispute what happened next. Plaintiff put forth disputed evidence that the first thing Espinosa did was instruct bystanders to assist in putting Becker in a wheelchair then back on the floor.

It is undisputed that Espinosa checked Becker's carotid artery for a pulse and found none. Espinosa performed a sternum rub and got no response. Espinosa checked Becker's breathing, airway and circulation and found no signs of life. Becker's skin color was cyanotic, which means he had no blood circulation. Becker, however, had agonal breathing, which is not a sign of life.

Espinosa requested that Gutierrez or security call 911, but the parties dispute how quickly Espinosa made the request after reaching Becker. It is undisputed that records from the 911 call center indicate that the call center received an emergency call at 4:04:45 a.m.

Espinosa performed CPR, which did not change Becker's condition. Becker continued to have no pulse and agonal breathing. Espinosa connected the AED that Nowak had retrieved. The AED detected asystole and advised not to apply a shock. The parties agree that asystole

means an absence of cardiac activity, i.e., a cessation of electrical activity to the heart. The parties agree that asystole is not a shockable rhythm. Espinosa continued CPR until the paramedics arrived. Becker remained unconscious with only agonal breathing.

According to plaintiff, paramedics arrived at the Amazon facility at 4:09 a.m. It is undisputed that the four paramedics were delayed up to a minute getting into the front door, and it took them another five to seven minutes to reach Becker due to the size of the facility. Each of the four paramedics was trained in advanced cardiac life support, including medications.

The paramedics continued CPR (which they started at approximately 4:19 a.m., according to the paramedics' report). Becker was unresponsive and had no pulse or blood pressure. The paramedics gave Becker three doses of epinephrine (the first of which, according to the paramedics' report, was administered at approximately 4:22 a.m.). Becker did not respond. The paramedics attached their own AED, placed Becker on a stretcher and wheeled him out of the facility.

The paramedics transported Becker to the nearest hospital, where he was pronounced dead. No autopsy was performed. Becker's primary care physician signed the death certificate, assigning as the cause of death acute myocardial infarction due to hypercholesterolemia (high cholesterol).

Each party hired an expert witness, and neither party challenges the admissibility of the opposing expert's report.

Plaintiff's expert, Dr. MacGregor, opined:

> The survival rate for patients who experience an out-of-hospital cardiac arrest is overall about 10%. The survival rate is much higher than 10% for patients who have rhythms that can be treated promptly following the cardiac arrest, with an electrical shock, including patients with ventricular tachycardia and ventricular fibrillation. It has been reported that early CPR plus defibrillation within 3 to 5 minutes of collapse can produce survival rates as high as 41% to 74%.

> Coronary artery disease almost always causes cardiac arrest by initially causing one of two arrythmias, ventricular fibrillation or pulseless ventricular tachycardia. In a patient like Mr. Becker the trigger for the arrythmia would almost certainly be myocardial ischemia (insufficient oxygenated blood reaching the heart muscle caused by a blocked artery). Early defibrillation (applying an electrical shock to the chest wall) can convert ventricular fibrillation and ventricular tachycardia back to a normal rhythm. Over a number of minutes, following an untreated cardiac arrest caused by ventricular fibrillation or pulseless ventricular tachycardia, these rhythms progress to asystole (the absence of electrical activity). Asystole is not a rhythm that is treated with an electrical shock.
>
> In my opinion, Thomas Becker's cardiac arrest was, more likely than not, caused by coronary artery disease which caused myocardial ischemia, that triggered ventricular tachycardia or ventricular fibrillation. Minutes elapsed before a defibrillator was attached to his chest. During that time his heart rhythm deteriorated to asystole, which was the rhythm detected when the defibrillator was attached. If a defibrillator had been attached to Mr. Becker in the early minutes of his cardiac arrest he would have likely had ventricular tachycardia or ventricular fibrillation, both of which are shockable rhythms. If Mr. Becker had been defibrillated in the early stage of his cardiac arrest his chance of survival would have been much higher, compared to his chance of survival with later attachment of the AED after the onset of asystole.

[Dr. MacGregor opinion at 3/Docket 100-13 at 2-3] (internal citation omitted).

Defendant's expert, Dr. Fintel, opined:

> 7. The AED did not deliver a shock to Becker because it detected an asystolic rhythm. Asystole is the absence of ventricular contractions in the context of a lethal heart arrhythmia. Asystole is the most serious form of cardiac arrest and is usually irreversible. Asystole, commonly referred to as a "cardiac flatline," is the state of total cessation of electrical activity from the heart, which means no tissue contraction from the heart muscle and therefore no blood flow to the rest of the body. Asystolic patients usually present with a very poor prognosis. Asystole is found initially in only about 28% of cardiac arrest cases in hospitalized patients, but only 15% of these survive, even with the benefit of an intensive care unit. Out-of-hospital survival rates (even with emergency intervention such as CPR) are less than 2%. Asystole is considered a terminal rhythm of cardiac arrest. Termination of resuscitation efforts are strongly considered during an in-hospital cardiac arrest resulting in asystole. There is no evidence to suggest a cause for this patient's asystolic rhythm and also no indication that this patient's condition was treatable in a manner to prevent death.
> \* \* \*
> 9. Based on my education, training and experience as a Board Certified Cardiologist, I am familiar with the types and kinds of cardiac events

6

that end in sudden death such as the events involving Thomas Becker as alleged by the plaintiff in the plaintiff's complaint. Certain cardiac events will not respond to intervention to prevent death of the patient. An autopsy may reveal the precise cause or nature of the cardiac event which results in sudden cardiac death. No autopsy was performed on Mr. Becker. In this matter, even in the absence of autopsy, based upon the available evidence, this patient would not have survived this cardiac event even if the event occurred in a hospital setting. As noted above, out-of-hospital survival rates (even with emergency intervention such as CPR) are less than 2%. Asystole is considered a terminal rhythm of cardiac arrest. To a reasonable degree of certainty, no amount of intervention was likely to change the outcome in this matter.

10. . . . [I]t is my opinion to a reasonable degree of medical probability that Thomas Becker expired from an unexpected and unanticipated cardiac event which was not survivable. The nature and timing of the attempted intervention by Mr. Espinosa and by the Joliet EMS crew did not have a causal impact on Becker's death. Mr. Becker's death was presumptively caused by an unknown and undetermined cardiac etiology as no other explanation is available absent guess, speculation or conjecture. There is no evidence to suggest that any medical intervention in the minutes following Becker's collapse as reported anecdotally by his co-workers had any or would have had any impact on the patient's life-ending events. I conclude there is no causal relationship between the end of Mr. Becker's life and the nature, extent, or timing of the attempted intervention to revive him.

[Dr. Fintel Decl. ¶¶ 7, 9, 10/Docket 91-15 p. 14-17].

## II. STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). When considering a motion for summary judgment, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021 (7th Cir. 2018). Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if

7

sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

### III. DISCUSSION

It is clear that the parties dispute many facts related to this case. The question is whether any of the fact disputes are material to the outcome of this case.

In plaintiff's second amended complaint [95], she asserts three claims. In Counts I and III, respectively, plaintiff seeks damages for negligence under the Wrongful Death Act, 740 ILCS 180/1, and the Survival Act, 755 ILCS 5/27-6. In Count II, plaintiff asserts wilful and wanton conduct.

To establish negligence, plaintiff must "prove the existence of a duty owed by the defendant, a breach of that duty, and injury proximately resulting from that breach." *Bogenberger v. Pi Kappa Alpha Corp., Inc.*, 104 N.E.3d 1110, 1118 (Ill. 2018).

*Duty*

The Court first considers the extent of defendant's duty to plaintiff, who worked in defendant's facility as an employee of a third party, not as an employee of defendant. Defendant concedes that it owed a duty to provide first aid. Plaintiff's second amended complaint makes clear that plaintiff believes this means defendant had a duty quickly to perform CPR, utilize an AED and call paramedics. Defendant argues that it had no duty to utilize an AED. In her

response, plaintiff does not argue that defendant owed a duty to use an AED, let alone cite any law to support such an argument.[3]

"Whether a duty exists is a question of law for the court to decide." *Bogenberger*, 104 N.E.3d at 1118. In considering whether defendant had a duty to utilize an AED, this Court's job is to predict how the Illinois Supreme Court would decide the issue. *Nationwide Agribusiness Ins. Co. v. Dugan*, 810 F.3d 446, 450 (7th Cir. 2015) ("As a federal court sitting in diversity jurisdiction, our task is to predict how the Illinois Supreme Court would decide issues presented here."); *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002) ("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question.").

Defendant, as a property owner, was not the "insurer[] of the plaintiff's safety." *Culli v. Marathon Petroleum Co.*, 862 F.2d 119, 123 (7th Cir. 1988) (citing *Anderson v. Woodlawn Shell Inc.*, 132 Ill.App.3d 580, 478 N.E.2d 10, 12 (1st Dist. 1985)). The Illinois Supreme Court has explained:

> Under common law, the universally accepted rule, articulated in section 314 of the Restatement (Second) of Torts, and long adhered to by this court, is that a private person has no duty to act affirmatively . . . absent a 'special relationship' between the parties. Historically, there have been four 'special relationships' which this and other courts have recognized, namely, common carrier-passenger, innkeeper-guest, business invitor-invitee, and voluntary custodian-protectee. When one of these special relationships exists between the parties and an unreasonable risk of physical harm arises within the scope of that relationship, an obligation may be imposed on the one . . . *to render first aid when it is known that such aid is needed*. See *Fancil v. Q.S.E. Foods, Inc.*, 60 Ill.2d 552, 559-60 (1975); Restatement (Second) of Torts § 314A (1965).

---

[3] Any arguments plaintiff could have made with respect to the extent of defendant's duty are waived.

9

*Iseberg v. Gross*, 227 Ill.2d 78, 87-88 (Ill. 2007) (internal citations omitted); *see also Bogenberger*, 104 N.E.3d at 1121 (citing Restatement (Second) of Torts §§ 314, 314A, 315 (1965)). Thus, it is clear, as defendant concedes, that defendant, as business invitor, owed plaintiff, as invitee, a duty to render first aid once defendant was aware that Becker needed first aid.

The Court agrees with defendant, however, that defendant's duty to render first aid did not extend to utilizing an AED. Specifically, the Court predicts that the Illinois Supreme Court would conclude that defendant did not owe a duty to utilize an AED. The Illinois Supreme Court has adopted § 314A with respect to the duty owed to an invitee, and a fair reading of that section does not require defendant to utilize an AED. That section states, "The duty to give aid to one who is ill or injured extends to cases where the illness or injury is due to natural causes[.]" Restatement (Second) of Torts § 314A(e) (1965). It further states:

> The defendant is not required to take any action until he knows or has reason to know that the plaintiff is . . . ill. He is not required to take any action beyond that which is reasonable under the circumstances. In the case of an ill or injured person, he will seldom be required to do more than *give such first aid as he reasonably can*, and take reasonable steps to turn the sick man over to a physician . . .

Restatement (Second) of Torts § 314A(f) (1965) (emphasis added).

Based on § 314A, an Illinois Appellate Court has concluded that a business does "not have a duty to defibrillate" an invitee. *Salte v. YMCA Metropolitan Chi. Foundation*, 351 Ill.App.3d 524, 529 (2nd Dist. 2004) ("The use of a defibrillator requires specific training and we believe that its use is far beyond the type of 'first aid' contemplated by Restatement section 314A."). The court explained that the duty to render first aid "did not require defendant to

provide, or to be prepared to provide, all medical care that it could reasonably foresee might be needed by a patron." *Salte*, 351 Ill.App.3d at 529.[4]

Courts outside of Illinois also agree, based on § 314A, that there is no common-law duty to use an AED on a business invitee. *Abramson v. Ritz Carlton Hotel Co, LLC*, 480 Fed.Appx. 158, 162 (3rd Cir. 2012) ("[A] common understanding of 'first aid' does not encompass the use of an oxygen tank or AED any more than it encompasses an intubation kit. Rather, 'first aid,' involves simple procedures that can be performed with minimal equipment and training, such as bandaging and repositioning. CPR—which [plaintiff] indisputably received—lies at the outer limit of the term.") (applying New Jersey law); *Wallis v. Brainerd Baptist Church*, 509 S.W.3d 886, 903-04 (Tenn. 2016) (Because "a business is not required to provide all the medical treatment it could reasonably foresee might be needed by its patrons, nor is it required to provide the sort of aid that requires special training to administer," the defendant, which had acquired an AED, "had no common law duty to [plaintiff] to acquire an AED or to make it available for use, or to use it."); *Verdugo v. Target Corp.*, 59 Cal.4th 312, 341 (Cal. 2014) ("[U]nder California

---

[4] Unpublished decisions by Illinois Appellate Courts also support this Court's conclusion. In *Wing*, the Second District found no common-law duty to use an AED even where the defendant already possessed an AED. *Wing v. Butterfield Country Club*, 2017 IL App (2d) 160900-U ¶ 23 (2nd Dist. 2017) (although "defendant had [an AED] on its premises," the court "cannot say that defendant in the present case had a common law duty to use the AED device on plaintiff decedent as the use of such a device is not the type of first aid contemplated by the Restatement section 314A, even though plaintiff assures us that such a device is quite 'foolproof.'"). In *Duran*, the First District rejected a plaintiff's argument that a defendant's decision to purchase an AED imposed a duty to use it. *Duran v. Oak Lawn Community H.S. Dist. No. 229*, 2012 IL App (1st) 110633-U ¶ 36 (First Dist. 2012) ("[W]e do not believe it would be appropriate to impose a legal duty on a party to provide emergency medical care simply because that party voluntarily purchased an AED. Such a holding might discourage institutions from purchasing such medical devices."). Here, plaintiff does not argue that defendant voluntarily undertook the duty to use the AED by purchasing it.

law, Target owes no common law duty to its customers to acquire and make available an AED.").

This Court agrees with those courts that have concluded that use of an AED goes beyond the duty to provide first aid, as outlined in § 314A of the Restatement (Second) of Torts. This Court agrees that a business is not required to provide all medical care that could foreseeably be needed by an invitee and that use of an AED goes beyond the first aid anticipated by § 314A. This Court predicts the Illinois Supreme Court, which has adopted and applied that section with respect to the duty of a business to an invitee, would reach the same conclusion.

Because defendant had no duty to use an AED on Becker, it could not have breached that duty by not using the AED quickly enough.

Nonetheless, defendant had a duty to provide first aid, and plaintiff argues that the failures with respect to that first aid were the proximate cause of Becker's injury.

*Proximate cause*

Under Illinois law,

> [t]he term 'proximate cause' embodies two distinct concepts: cause in fact and legal cause. When considering cause in fact, courts generally employ either the traditional 'but for' test or the 'substantial factor' test. Under the 'but for' test, 'a defendant's conduct is not the cause of an event if the event would have occurred without it.' Under the 'substantial factor' test, 'the defendant's conduct is said to be a cause of an event if it was a material element and a substantial factor in bringing the event about.'
>
> In contrast, legal cause involves an assessment of foreseeability. Courts ask whether the injury is the type of injury that a reasonable person would see as a 'likely result' of his or her conduct, or whether the injury is so 'highly extraordinary' that imposing liability is not justified.

*Turcios v. DeBruler Co.*, 32 N.E.3d 1117, 1124 (Ill. 2015) (citations omitted); *see also Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 640 n. 1 (7th Cir. 2008) ("'Causation-in-fact' exists where 'there is a reasonable certainty that a defendant's acts caused the injury or damage,'

12

meaning that the injury would not have occurred absent the conduct. In contrast, 'legal causation' is a question of foreseeability that asks 'whether the injury is of a type that a reasonable person would see as a likely result of his or her conduct.") (citations omitted).

Before considering whether plaintiff has put forth enough evidence to convince a jury that defendant's breach of duty was a proximate cause of Becker's injury, the Court clarifies one issue. Plaintiff seems to be arguing that the "loss of chance" or "lost chance" doctrine is a means of establishing proximate cause. (Plf. Brief at 9/Docket 98 at 9) ("Proximate cause may be established under the "loss of chance" or "lost chance" doctrine by preponderance of evidence that defendant's conduct increased risk of harm to plaintiff or lessened effectiveness of plaintiff's treatment[.]"). The Court disagrees. "Loss of chance," a concept usually applied in a medical malpractice case, is a type of *injury*, not a means of establishing proximate cause. *See Miranda v. County of Lake*, 900 F.3d 335, 348 (7th Cir. 2018) ("the injury can be the decedent's lost chance at survival"); *Holton v. Memorial Hosp.*, 176 Ill.2d 95, 111 (Ill. 1997) ("'Lost chance' or 'loss of chance' in medical malpractice actions refers to the *injury* sustained by a plaintiff whose medical providers are alleged to have negligently deprived the plaintiff of a chance to survive or recover from a health problem, or where the malpractice has lessened the effectiveness of treatment or increased the risk of an unfavorable outcome to the plaintiff.") (emphasis added). Assuming "loss of chance" applies outside of medical malpractice,[5] the plaintiff must still establish proximate cause, which is to say that the defendant breached a duty and that the breach

---

[5] The Court assumes, without deciding, that the doctrine would apply outside of medical malpractice. Example 5 of § 314A of the Restatement (Second) of Torts suggests as much. It says, "A, a patron attending a play in B's theatre, suffers a heart attack during the performance, and is disabled and unable to move. He asks that a doctor be called. B's employees do nothing to obtain medical assistance, or to remove A to a place where it can be obtained. As a result, A's illness is aggravated in a manner which reasonably prompt medical attention would have avoided. B is subject to liability to A for aggravation of his illness."

proximately caused the injury, i.e., the lost chance. *See Bailey v. Mercy Hosp. and Med. Ctr.*, 2021 IL 126748 ¶ 56, __ N.E.3d __, __ (Ill. 2021) ("Our decision in *Holton* held that the loss of chance doctrine . . . does not relax, lower, or otherwise alter a plaintiff's burden of proving causation.").

The gist of plaintiff's proximate cause argument is "CPR plus defibrillation within the first three to five minutes would have provided Becker with his best chance of survival." (Plf. Brief at 6/Docket 98 at 6). Plaintiff has put forth admissible evidence in support of that argument in the form of an expert witness, Dr. MacGregor, who opined, "early CPR plus defibrillation within 3 to 5 minutes of collapse can produce survival rates as high as 41% to 74%" and "[i]f Mr. Becker had been defibrillated in the early stage of his cardiac arrest his chance of survival would have been much higher[.]"

Under plaintiff's theory, Becker might have survived had Espinosa used an AED on Becker sooner. Plaintiff wants to hold defendant liable, because Espinosa failed to use the AED quickly enough. This argument fails, because, as the Court has already concluded, defendant had no duty to use an AED. Defendant is not liable for failing to perform quickly enough an act it had no duty to perform. Without a duty, there can be no negligence. *Washington v. City of Chi.*, 188 Ill.2d 235, 239 (Ill. 1999) ("'[U]nless a duty is owed, there is no negligence,' and plaintiff[] cannot recover as a matter of law.") (citations omitted).

It was not just defendant that might have used an AED sooner. The paramedics, too, had an AED. Defendant had a duty to render first aid, and no one disputes that that duty included a duty to call 911. Thus, if plaintiff put forth evidence from which a reasonable jury could conclude that a delay in calling 911 was the proximate cause of Becker's injury, then plaintiff would be entitled to a trial. Again, plaintiff put forth the opinion of an expert witness, who

14

opined that had Becker been treated with CPR and an AED within three to five minutes, his chances of survival would have been higher. Plaintiff also put forth evidence that the paramedics were called at 4:04:45 and arrived at defendant's facility at 4:09, which is to say it took at least four minutes and fifteen seconds for the paramedics to arrive. Plaintiff also put forth evidence that, once inside the facility, it took the paramedics five to seven additional minutes to reach Becker, due to the size of the facility. Thus, even if C&W employees had radioed AmCare the instant they noticed Becker in distress and even if AmCare had called 911 the instant it received the radio transmission about Becker, it still would have taken between nine minutes fifteen seconds and eleven minutes fifteen seconds for paramedics to reach Becker with an AED. That is not within the three-to-five-minute window plaintiff's expert opined would have given Becker a chance to survive. Plaintiff has put forth no evidence that using an AED nine to eleven minutes after collapse would have improved Becker's chances of survival. Rather, plaintiff admits "[t]he literature, Dr. MacGregor and Dr. Fintel all agree that once a person has been in arrest for more than 10 minutes their chances of survival are zero." (Plf. Brief at 8/Docket 98 at 8). Accordingly, plaintiff has not put forth evidence from which a reasonable jury could conclude that defendant's delay in calling 911 was a substantial factor in Becker's injury. Plaintiff has not created a jury issue on whether a delay in calling 911 proximately caused Becker's injury.

  Defendant is entitled to judgment as a matter of law on plaintiff's negligence claims. In addition, with respect to Count II, defendant correctly points out that, under Illinois law, wilful and wanton conduct is not a separate tort. *Ziarko v. Soo Line Railroad*, 161 Ill.2d 267, 274 (Ill. 1994). Plaintiff did not respond to the argument. Defendant is granted summary judgment on Counts I, II and III.

## IV. CONCLUSION

For all of these reasons, the Court grants defendant's motion [89] for summary judgment. Defendant is entitled to judgment as a matter of law on Counts I, II and III. Civil case terminated.

**SO ORDERED.**                  **ENTERED: April 4, 2022**

**HON. JORGE ALONSO**
**United States District Judge**